UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MARIE MERISIER,

                                Plaintiff,

                                                    **MEMORANDUM AND ORDER**
            -against-                                15-CV-2739 (RRM) (RML)

KINGS COUNTY HOSPITAL,

                                Defendant.
-------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

Plaintiff Marie Merisier, proceeding *pro se*, brings this action against her employer,

Kings County Hospital ("KCH"), alleging violations of Title VII of the Civil Rights Act of 1964,

42 U.S.C. §§ 2000e *et seq.*, New York City Human Rights Law, and New York State Human

Rights Law, based on harassment, unequal pay, and disciplinary actions taken against her while

she worked for KCH, as well as retaliation.  (Second Amended Complaint ("SAC") (Doc. No.

43).)  Before the Court is Kings County Hospital's motion for summary judgment.  (Notice of

Motion (Doc. No. 69-1).)  For the reasons explained below, Kings County Hospital's motion is

granted.

## BACKGROUND

### I.      Factual Background

The relevant facts outlined below are drawn from the parties' Local Rule 56.1 Statements

of Material Facts, as well as evidence submitted by the parties in connection with the motion for

summary judgment.  Unless otherwise noted, the facts are undisputed.

Plaintiff Marie Merisier is a Black American.  (Def.'s Rule 56.1 Statement of Facts

("Def.'s SOF") (Doc. No. 69-20) ¶ 1; Pl.'s Reply Rule 56.1 Statement of Facts ("Pl's SOF")

(Doc. No. 70-11) ¶ 1.)  Merisier began working as a phlebotomist at KCH in June 2007 and is

still employed there.  (Def's SOF ¶¶ 2–4; Pl's SOF ¶¶ 2–4.)  Since she was hired, Merisier has only ever held the title of phlebotomist.  (Def's SOF ¶ 5, Pl's SOF ¶ 5.)

### A.  Disciplinary Incidents

Prior to 2013, Merisier was counseled regarding her alleged "failure to maintain self-control" in the presence of a patient, her behavior and attitude, and the use of a radio in the laboratory.  (Def.'s SOF ¶ 47; Pl.'s SOF ¶ 47; *see also* Mildner Declaration, Exhibit N.)

In August 2013, Tashni-Ann Foster, who is employed by an outside agency but works at KCH, reported Merisier for using profanity.  (Def.'s SOF ¶ 33; Pl.'s SOF ¶ 33; *see also* Mildner Declaration, Exhibit I.)  Foster is Black and her national origin is Jamaican.  (Def.'s SOF ¶ 34; Pl.'s SOF ¶ 34.)  Foster alleged in her complaint that Merisier – upset that Khalid Sheikh, Merisier's supervisor, had given Foster a key to a hospital closet door – said loudly, among other profanities, "who the 'fuck' does Khalid think he is to give you a 'fucking' key… I didn't want you to have a key."  (Mildner Declaration, Exhibit K.)  Merisier was called to a meeting in December 2013 regarding Foster's allegations, at which Merisier was accompanied by a union representative.  (Def.'s SOF ¶¶ 35–36; Pl.'s SOF ¶¶ 35–36.)  At this meeting, Merisier was told that she would either be terminated or she could agree to accept a twenty-day unpaid suspension; she elected the suspension and returned to work in January 2014.  (Def.'s SOF ¶¶ 37–38; Pl.'s SOF ¶¶ 37–38.)

In February 2014, Foster accused Merisier of threatening and cursing at her, though Merisier denies she did so.  (Def.'s SOF ¶ 39; Pl.'s SOF ¶ 39.)  Foster reported to the hospital police that Merisier approached her, "looked at [Foster] with evil in her eyes and said, Im gonna [*sic*] FUCK YOU UP."  (Mildner Declaration, Exhibit P.)  Merisier was served with disciplinary charges from this incident, which, after much delay, were scheduled to be adjudicated by the

New York City Office of Administrative Trials and Hearings ("OATH") in 2019; these charges were ultimately dropped. (Def.'s SOF ¶¶ 40–41; Pl.'s SOF ¶¶ 40–41; *see also* Merisier Affidavit, Exhibit F.) Merisier identifies two days when she was allegedly required to appear at OATH proceedings without pay and on "personal time": August 25, 2016, and August 7, 2018. (Response ¶ 11.)

On September 23, 2015, Merisier was involved in an incident with Natasha Herbert, another KCH Employee. (Def.'s SOF ¶ 42; Pl.'s SOF ¶ 42.) Herbert is Black Guyanese. (Def.'s SOF ¶ 43; Pl.'s SOF ¶ 43.) Both Herbert and Merisier filed complaints with hospital police, accusing the other of assaulting them by bumping them in the shoulder twice. (Def.'s SOF ¶¶ 44–45; Pl.'s SOF ¶¶ 44–45.) Merisier received a warning notice after this incident. (Def.'s SOF ¶ 46; Pl.'s SOF ¶ 46.)

### B. Comparative Pay

Though the parties agree how much Merisier and her coworkers earned in 2017, they disagree as to whether KCH paid Merisier less than similarly situated phlebotomists in 2018.

Defendant submits that Merisier's annual salary in 2018 was $41,230. (Def's. SOF ¶ 6; *see also* Mildner Declaration, Exhibit B.) Merisier disputes this, claiming she only earned $38,368.20 in 2018. (Pl.'s SOF ¶ 6; *see also* Merisier Affidavit, Exhibit H.) In 2017, Merisier earned $41,667.37. (Def.'s SOF ¶ 7; Pl.'s SOF ¶ 7.)

Key Fernandez has worked as a phlebotomist at KCH since September 2008. (Def's SOF ¶ 9; Pl's SOF ¶ 9.) Merisier believes Fernandez is Hispanic, her national origin is Dominican, and she is "not white, but light." (Def.'s SOF ¶ 12; Pl's SOF ¶ 12.) The parties agree that Fernandez received gross pay of $42,351.93 in 2017, (Def's SOF ¶ 11; Pl.'s SOF ¶ 11), but disagree about 2018. KCH submits a payroll printout as proof that Fernandez's annual salary in

2018 was $41,182, (Def's SOF ¶ 10; *see also* Mildner Declaration, Exhibit C at 2), while

Merisier submits pay stub information indicating that Fernandez earned $48,363.19 in 2018.

(Pl's SOF ¶ 10; *see also* Merisier Affidavit, Exhibit H.)  Nadia Hassam has worked as a

phlebotomist at KCH since November 2008.  (Def's SOF ¶ 13; Pl's SOF ¶ 13.)  Merisier

believes, and KCH does not dispute, that Hassam's "race is Algerian," her national origin is

"African," and that her "color is white."  (Def.'s SOF ¶ 16; Pl.'s SOF ¶ 16.)  The parties agree

that Hassam received gross pay of $44,823.32 in 2017.  (Def.'s SOF ¶ 15; Pl's SOF ¶ 15.)

However, they disagree about 2018.  KCH submits a payroll printout to show that Hassam's

annual salary in 2018 was $41,182.  (Def's S OF ¶ 14; *see also* Mildner Declaration, Exhibit D.)

Merisier submits pay stub information indicating that Hassam earned $49, 270.15 in 2018.  (Pl's

SOF ¶ 14; *see also* Merisier Affidavit, Exhibit H.)  Muhammad Aurangzeb has worked at KCH

as a phlebotomist since April 2013.  (Def.'s SOF ¶ 17; Pl.'s SOF ¶ 17.)  Merisier believes, and

KCH does not dispute, that Aurangzeb's "race is Pakistani" and Aurangzeb's "national origin in

Pakistan."  (Def.'s SOF ¶ 20; Pl.'s SOF ¶ 20.)  The parties agree that Aurangzeb received gross

pay of $40,760.06 in 2017, (Def.'s SOF ¶ 19; Pl.'s SOF ¶ 19), but disagree about 2018.  KCH

submits a payroll printout to show that Aurangzeb's annual salary in 2018 was $41,140.  (Def.'s

SOF ¶ 18; *see also* Mildner Declaration, Exhibit E.)  Merisier disputes this and submits a pay

stub indicating that Aurangzeb earned $48,836.41 in 2018.  (Pl.'s SOF ¶ 18; *see also* Merisier

Affidavit, Exhibit H.)  Mohammad Mughees has worked at KCH as a phlebotomist since April

2013.  (Def.'s SOF ¶ 21; Pl.'s SOF ¶ 21.)  Merisier believes, and KCH does not dispute, that

Mughees's "race is Pakistani" and his "national origin in Pakistan."  (Def.'s SOF ¶ 24; Pl.'s SOF

¶ 24.)  The parties agree that Mughees received gross pay of $39,160.43 in 2017, (Def.'s SOF

¶23; Pl.'s SOF ¶ 23), but disagree about 2018.  KCH submits a payroll printout to show that

Mughees's annual salary in 2018 was $39,752, (Def.'s SOF ¶ 22; *see also* Mildner Declaration, Exhibit F), while Merisier relies on a pay stub indicating that Mughees earned $47,407.78 in 2018. (Pl.'s SOF ¶ 22; *see also* Merisier Affidavit, Exhibit H.) Julissa Ferreira has worked at KCH as a phlebotomist since April 2014. (Def.'s SOF ¶ 25; Pl.'s SOF ¶ 25.) Merisier believes, and KCH does not dispute, that Ferreira's "race is Hispanic," her "national origin is Puerto Rican," and her "color is 'light-skinned.'" (Def.'s SOF ¶ 28; Pl.'s SOF ¶ 28.) The parties agree that Ferreira received gross pay of $38,743.46 in 2017. (Def.'s SOF ¶ 27; Pl.'s SOF ¶ 27.) They disagree about 2018. KCH relies on a payroll printout to show that Ferreira's annual salary in 2018 was $41,140. (Def.'s SOF ¶ 26; *see also* Mildner Declaration, Exhibit G.) Merisier submits a pay stub indicating that Ferreira earned $36,232.65. (Pl.'s SOF ¶ 26; *see also* Merisier Affidavit, Exhibit H at 8.) Shelina Christian has worked at KCH as a phlebotomist since July 2014. (Def.'s SOF ¶ 29; Pl.'s SOF ¶ 29.) The parties agree that Christian is Indian, (Def.'s SOF ¶ 32; Pl.'s SOF ¶ 32), and that her gross pay for 2017 was $46,002.86. (Def.'s SOF ¶ 31; Pl.'s SOF ¶ 31). They also agree that Christian was paid an hourly rate of $22.51 per hour in 2018. (Def.'s SOF ¶ 30; Pl.'s SOF ¶ 30.) Merisier submits a pay stub showing Christian earned $46,002.86 in 2018. (Pl.'s SOF ¶ 30; *see also* Merisier Affidavit, Exhibit H.)

### C. Right-To-Sue Letter

Merisier filed a letter with the Equal Employment Opportunity ("EEO") office within the hospital alleging discriminatory practices in the phlebotomy department on December 5, 2013. (SAC ¶ 3.) On January 10, 2014, Merisier filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (SAC ¶ 17.) The EEOC issued a right-to-sue letter on or

about March 30, 2015.  (Compl. (Doc. No. 1) at 7–9.) [1]  Merisier timely commenced this action on May 12, 2015.  (*Id*.)

## II.    Plaintiff's Claims

Merisier filed her SAC on April 19, 2018, bringing claims for alleged race, color, and national origin discrimination in violation of  Title VII, as well as New York State and City Human Rights Laws.  (SAC.)  Specifically, she alleges that she has been paid less than other phlebotomists, denied overtime and training, and subject to disciplinary actions that were motivated by discriminatory animus.  (*See generally* SAC.)[2]  Merisier further alleges that the disciplinary actions taken against her were retaliation for filing an informal complaint in December 2013 and filing an EEOC charge in January 2014.  (*Id*.)

## III.    Motion for Summary Judgment

KCH now moves for summary judgment.

KCH first argues that Merisier has failed to establish a prima facie case of race, color, or national origin discrimination.  (Def.'s Mot. for Summ. J. ("Mot.") (Doc. No. 71) at 6–9.)  KCH states that Merisier alleges animus as a motivating factor in the alleged false accusations underlying her disciplinary actions, but Merisier fails to present any evidence that the alleged animus was based on her race, color, or national origin.  (*Id.* at 7–9.)  Further, KCH points to the several reports of misconduct against Merisier as a legitimate, non-discriminatory reason for the alleged adverse employment actions she faced.  (*Id.* at 10.)  Merisier responds that the disciplinary actions she faced constituted adverse employment actions, and that KCH has "willfully subjected [her] to undue hardship and unlawful discrimination based on [Merisier's]

---

[1] All page numbers correspond to ECF pagination.
[2] Although the SAC also alleges that KCH passed Merisier over for promotions, Merisier has not adduced any evidence in support of this claim.

race/color and national origin…" (Pl.'s Resp. to Def.'s Mot. Summ J ("Response") (Doc. No. 70), *see also* Response ¶¶ 8, 10).  Merisier further argues that it was harassment and retaliation for KCH to "drag[] out termination proceeding[s] at 'OATH' for over a five-year period on a false claim" and require her to use unpaid personal days to attend OATH proceedings. (Response ¶ 11.)  KCH replies that Merisier has not explained how the OATH proceedings or other disciplinary events constitute an adverse employment action or were motivated by discriminatory animus.  (Def.'s Reply Mem. ("Reply") (Doc. No. 71) at 8–9.)  KCH reiterates that there were legitimate, non-discriminatory reasons for the disciplinary charges Merisier faced, whether or not Merisier disputes the underlying allegations.  (*Id*. at 10.)

KCH also argues that Merisier has failed to establish a prima facie case of race, color, or national origin discrimination because she cannot support her allegation that she was denied the opportunity to be trained as a Lab Technician.  (Mot. at 10–11.)  In her SAC, Merisier describes being informed that her colleague Fernandez was in training to be a Lab Technician and soon would be moving up to the sixth floor lab, at which point Merisier would move down to the pediatrics wing on the fifth floor; Merisier asserts that she was never offered this training, which is discrimination on the basis of her race, color, and national origin.  (SAC ¶ 2.)   In response to this allegation, KCH explains that to become a Lab Technician, one must obtain licensure from New York State.  (Mot. at 11.)  To be eligible for licensure, one must attend a program at one of New York State's Registered Programs, and KCH is not on the list of Registered Programs that can train individuals to become a Clinical Laboratory Technician.  (*Id*.)  Therefore, KCH states it would not be able to offer Merisier training to become a Laboratory Technician, as it is not certified to do so, and so Merisier cannot demonstrate discriminatory treatment in never being offered training that KCH does not provide.  (*Id*.)  Merisier does not respond to this argument.

Next, KCH argues that Merisier has failed to establish a prima facie case for pay discrimination, because she has not raised an inference of discrimination in the pay differences between her and her coworkers. (Mot. at 12.) Rather, KCH argues, the phlebotomists received similar annual salaries in 2017 and 2018, and the differences in 2018 gross pay are due to the fact that Merisier's coworkers – who are of diverse races and national origins – all worked overtime, whereas Merisier did not. (*Id*.) Moreover, KCH asserts that Merisier did not request overtime, and even if she had, she has not alleged sufficient facts to give rise to an inference of discriminatory denial based on her race or national origin. (*Id*. at 12–13.) In her response, Merisier asserts that she did request overtime "at least 25 times" in 2013–2014, and only stopped asking when her supervisor made it clear to her that he would not provide her with overtime. (Response ¶ 20.) Further, Merisier asserts that overtime was authorized for her other coworkers who were of "different ethnicit[ies]," (*Id*. ¶ 20), and though one of the coworkers who was allowed to work overtime is "Black Haitian," this does not defeat her claim of discrimination because she "is also alleging national origin/ethnicity discrimination" and "identifies as Black American," (*Id*. ¶ 22). KCH responds that Merisier has merely made a conclusory assertion that she was denied overtime, after previously testifying that she could not recall past requests to change her schedule and that she had not requested overtime in the past five years. (Reply at 12.) KCH asserts that Merisier has not raised an inference of discriminatory animus due to either her race or national origin in the alleged denial of overtime and resulting pay differential. (*Id*. at 13.)

Finally, KCH argues that Merisier fails to establish a prima facie case of retaliation, as she has not demonstrated a connection between her complaints and any adverse employment action. (Mot. at 10.) In her response, Merisier asserts that all the allegations of misconduct

against her are false, and KCH knew they were false, but continued to seek burdensome disciplinary proceedings against her in "retaliation for engaging in protected activity." (Response ¶¶ 5, 10, 12, 14.)  That Merisier was subject to a disciplinary hearing four days after she filed a complaint with the hospitals' EEO office is not evidence of retaliation, KCH argues, when that disciplinary proceeding began months prior.  (Reply at 11.)  Similarly, KCH asserts that the temporal proximity between Merisier's complaint to the EEOC and Foster's accusations that Merisier threatened her do not, without more, support a claim of retaliation.  (*Id.*)  KCH reiterates that there was a legitimate, non-discriminatory reason to investigate and discipline Merisier after she allegedly threatened a coworker and was involved in a violent altercation at work.  (*Id.* at 11–12.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it may impact the "outcome of the suit under the governing law."  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual

inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions . . . in the light most favorable to the party opposing the motion."  (citations omitted)).

Once the moving party has demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citation omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases and stating that the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation").  In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.

The Court bears in mind that in discrimination cases "'smoking gun' evidence of discriminatory intent is rare and most often must be inferred."  *Forsyth v. Fed'n Employment & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)), *abrogated on other grounds*, *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007).  Accordingly, the Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'"  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).

The same standards for summary judgment apply where, as here, the non-movant is proceeding *pro se*, although "the *pro se* litigant should be given special latitude in responding to a summary judgment motion."  *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015) (quoting *Knowles v. N.Y. City Dep't of Corr.*, 904 F. Supp. 217, 220 (S.D.N.Y. 1995)); *see also*

*Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.").

## DISCUSSION

### I.      McDonnell Douglas Framework

Courts evaluate Title VII discrimination claims under the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–05 (1973).  The *McDonnell Douglas* framework requires that the plaintiff first prove a prima facie case of employment discrimination.  After a plaintiff states a prima facie case of discrimination, the burden shifts to the employer to provide "a legitimate, non-discriminatory reason for its actions." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802.  If the employer satisfies this burden, the plaintiff must then establish that the employer's explanation is a pretext for discrimination.  *Velez v. SES Operating Corp.*, No. 07-CV-10946 (DLC), 2009 WL 3817461, at *11 (S.D.N.Y. Nov. 12, 2009).

### II.     Merisier's Disparate Treatment Discrimination Claims

To state a prima facie case of discrimination, a plaintiff must provide evidence that (1) she belongs to a protected group; (2) she was qualified for the position she held; (3) her employer took adverse action against her; and (4) that adverse action occurred under circumstances giving rise to an inference of discrimination.  *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The burden of stating a prima facie case is "not onerous," *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is often described as "*de minimis*."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

In its motion, KCH does not dispute that Merisier belongs to a protected group and that she was qualified for the position she held.  (*See generally* Mot.)  KCH argues that Merisier cannot make out her prima facie claim because (1) the disciplinary actions are not adverse employment actions and (2) she was not denied training, as she claims, and such an assertion is contradicted by the record.  (*Id*. at 6–10,13–15.)  Further, KCH argues even if Merisier did suffer an adverse employment action, it did not occur under circumstances giving rise to an inference of discrimination.  (*Id*. at 8–16.)

## A.     Adverse Employment Action

An adverse employment action is a "material adverse change in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted).  "An adverse employment action is … more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotations omitted) (internal citations omitted).  "[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Id*. at 91. Further, unadjudicated disciplinary charges are typically not adverse employment actions where, "if the charges were ultimately dismissed, [the employee] would not have suffered any adverse effect from them." *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996).

### 1.     Disciplinary Events

Merisier argues that her 20-day unpaid suspension for using foul language in December 2013, the disciplinary charges brought against her for allegedly threatening Foster in February 2014, and the warning she received after the altercation with Herbert in September 2015, were all based on false allegations that KCH should have known were fabricated.  (Response ¶¶ 5, 8,

12

10.)  She claims that Kings County's choice to pursue disciplinary actions against her, despite her assertions that the allegations were false, constituted adverse employment actions.  (*Id.*) However, whether the underlying allegations were false is not relevant to the question of whether KCH's responses constituted adverse employment actions.  Though Merisier disputes the underlying allegations, she does not dispute the authenticity of the three reports containing allegations of Merisier's misconduct.  KCH argues that, having received these reports, it commenced appropriate disciplinary events to address them.  The Court agrees.  In December 2013, Merisier voluntarily stipulated to a brief unpaid suspension in December 2013 in lieu of formal proceedings; this suspension does not constitute an adverse employment action as it is a reasonable enforcement of disciplinary policies.

Merisier next argues that the February 2014 disciplinary charges, and the subsequent delays in the OATH proceedings stemming from her February 2014 disciplinary charges, constituted adverse employment actions, causing her to miss work and use personal or vacation days in order to attend meetings relating to the OATH proceedings.  (Response ¶¶ 11–12.) These, too, cannot constitute adverse employment actions.  Pursuing disciplinary charges through the OATH system is a reasonable mode of enforcement of KCH's disciplinary policies. Further, the disciplinary charges brought to OATH were never adjudicated, and Merisier continued to work at KCH in the same role during the pendency of the OATH proceedings, so Merisier never experienced a resulting change in the terms and conditions of her employment. *See Yerdon*, 91 F. 3d at 378.  Merisier argues, in addition, that the OATH proceedings themselves should be considered an adverse employment action because during the five-year pendency of the OATH case she was required to appear at OATH proceedings on two days without pay.  (Response ¶ 11.)  Though delays in the OATH proceedings and these two unpaid

appearances were no doubt inconvenient, Merisier does not demonstrate that the OATH proceedings were disruptive enough to constitute a material change in the terms and conditions of her employment.  Therefore, Merisier has failed to show that the OATH proceedings constituted an adverse employment action.

Finally, Merisier argues that the counseling she received after the September 2015 incident with Ms. Herbert constituted an adverse employment action.  A counseling memorandum, without any effect on the terms and conditions of plaintiff's employment, does not constitute an adverse employment action.  *See Weeks v. New York State*, 273 F.3d 76, 86 (2d Cir. 2001) *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  Therefore, the September 2015 warning does not constitute an adverse employment action.

### 2.    Denial of Training

Merisier alleges that she experienced an adverse action in the form of denial of training opportunities.  Merisier states that at no point was she offered the opportunity to train to be a Lab Technician and that is discrimination on the basis of her race and national origin.  (*Id.*)  In response to Merisier's claim that she was denied training that was afforded to Fernandez, KCH maintains that it cannot provide such training because it is not certified to do so, and so it could not have discriminatorily denied Merisier this training opportunity.  (Mot. at 11.)  Conclusory statements that are unsupported by evidence and contradicted by the record are not sufficient to survive a motion for summary judgment.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  Merisier has not refuted KCH's argument by presenting any evidence to the contrary.  Therefore, Merisier has not met her burden with respect to the alleged denial of training opportunities.

### B.        Inference of Discrimination

Inference of discrimination "is a flexible [standard] that can be satisfied differently in differing factual scenarios.'"  *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (*quoting Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  "No one particular type of proof is required to show that Plaintiff's [adverse employment action] occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, 11-CV-3625 (MKB), 2013 U.S. Dist. LEXIS 107111, at *19–20 (E.D.N.Y. July 30, 2013 (internal quotations omitted).  To make out the fourth element of a prima facie case, a "plaintiff can establish an inference of discrimination through direct evidence of discriminatory intent, or through circumstantial evidence demonstrating that the employer treated the plaintiff less favorably than a similarly situated employee outside of his protected group." *Renaud v. Fed. Exp. Corp.*, No. 10-CV-4261 (LB), 2012 WL 34089, at *4 (E.D.N.Y. Jan. 6, 2012).  A plaintiff "may also satisfy this fourth element by demonstrating, *inter alia,* that the employer criticized plaintiff's performance in 'ethnically degrading terms,' or made 'invidious comments about others in the employee's protected group,' or otherwise demonstrated bias in 'the sequence of events leading to the plaintiff's discharge.'"  *Velez v. SES Operating Corp.*, No. 07-CV-10946 (DLC), 2009 WL 3817461, at *8 (S.D.N.Y. Nov. 12, 2009) (quoting *Abdu–Brisson*, 239 F.3d at 468).

Here, even if Merisier had shown that she had suffered an adverse employment action, she fails to raise an inference of discrimination.  Merisier merely asserts that she was discriminated against because of her race and national origin when she was falsely accused of misconduct and then subject to disciplinary actions.  (Response ¶¶ 5, 10, 12.)  She fails to provide any support to her assertion that the alleged discrimination was because of her race or

national origin beyond her subjective believe that this was so. *See Moore*, U.S. Dist. LEXIS 107111, at \*21 (a plaintiff's subjective belief that she was discriminated against due to her race and national origin, without more, is insufficient to support a discrimination claim) (collecting cases). Both Foster and Herbert, the two women who reported Merisier's alleged misconduct, are Black. (Def.'s SOF ¶¶ 43, 44; Pl.'s SOF ¶¶ 43, 44.) That KCH acted on the complaints of two Black employees against Merisier, another Black employee, does not provide evidence that Merisier faced discrimination based on her race. And though Merisier identifies Foster as being of Jamaican national origin and Herbert of Guyanese national origin, (Def.'s SOF ¶¶ 43, 44; Pl.'s SOF ¶¶ 43, 44), she does not provide any basis for her belief that the hospital dealt with these incidents in a discriminatory manner because of her national origin. Accordingly, Merisier does not make out the fourth element of a prima facie discrimination case.

Merisier therefore does not make out either the third or fourth elements of her prima facie case. Because Merisier fails to state a prima facie case of disparate treatment discrimination, KCH is entitled to summary judgment on Merisier's disparate treatment claim.

## III. Merisier's Pay Discrimination Claims

To state a prima facie case of pay discrimination under Title VII, a plaintiff must show that (1) she was a member of a protected class, (2) she was qualified for the job in question, (3) she received inequitable compensation, and (4) the compensation decision occurred under circumstances that raise an inference of discrimination. *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019) ("all Title VII requires a plaintiff to prove is that her employer discriminated against her with respect to her compensation . . . because of her . . . [membership in a protected class]"). With respect to the fourth element, "the plaintiff at all times bears the ultimate burden of proof," and cannot rely merely on the fact of disparate pay between members and non-

members of a protected class to meet her burden.  *See Whitt v. Kaleida Health*, 298 F. Supp. 3d 558, 575 (W.D.N.Y. 2018) (citing *Belfi v. Prendergrast*, 191 F.3d 129, 140 (2d Cir. 1999)).

Here, as above, KCH does not dispute that Merisier belongs to a protected class and that she was qualified for the position she held.  (*See* Mot at 14–15.)  KCH also does not dispute that Merisier has plausibly shown a difference in compensation as to her colleagues, though KCH argues that Merisier has failed to raise an inference of discriminatory animus because she presents no evidence that her lack of overtime or her compensation rate is related to her race or national origin.  (*Id*. at 16–17.)  Further, KCH argues that Merisier's assertion that she was denied overtime in 2013 and 2014 is both contradicted by the record and not responsive to their proffered explanation for the phlebotomists' 2018 pay.  (*Id*.)

Here, Merisier presents evidence of the compensation she and other phlebotomists received in 2017 and 2018 to support her claim of pay discrimination.  In 2017, Merisier earned $41,667.37.  (Def.'s SOF ¶ 7; Pl.'s SOF ¶ 7.)  Merisier earned more that year than all but two of the salaried phlebotomists that she presents as comparators: Key Fernandez, a Hispanic woman of Dominican origin, earned $42,351.93; and Nadia Hassam, an Algerian woman, earned $44,823.32.  (Def.'s SOF ¶¶ 11, 15; Pl.'s SOF ¶¶ 11, 15.)  Another phlebotomist, Shelina Christian, earned a total of $46,002.86 in 2017, compensated hourly.  (Def.'s SOF ¶¶ 31; Pl.'s SOF ¶¶ 31.)  Far from demonstrating pay discrimination, this data from 2017 indicates that Merisier is similarly compensated as compared to the other phlebotomists with whom she is similarly situated.

KCH presents evidence of comparator annual salaries in 2018 to demonstrate that Merisier received the highest annual salary of the comparator phlebotomists at $41,230.  (*See* Def.'s SOF ¶¶ 6, 10, 14, 18, 22, 26; *see also* Mildner Declaration, Exhibits B–G.)  However,

Merisier submits pay stubs showing that despite her high annual salary, she earned gross pay in 2018 that was less than all but one of her comparators, at $38,368.20.  (*See* Pl.'s SOF ¶¶ 6, 10, 14, 18, 22, 26; *see also* Merisier Affidavit, Exhibit H.)  These pay stubs demonstrate that Hassam and Aurangzeb earned the highest gross pay, at $49,270.15 and $48,836.41, respectively.  (Pl.'s SOF ¶¶ 6, 10.)  In its motion, KCH argues that the comparators who earned more than the annual salary reported by KCH earned this additional pay through working overtime, while Merisier did not work overtime or request it.  (Mot. at 12–13.)

Merisier argues that she was discriminatorily denied overtime after requesting it "at least 25 times" between 2013 and 2014, but her supervisor, Khalid Sheikh, denied all of these requests.  (Response ¶ 20; *see also* Pl.'s SOF ¶ 8.)  Merisier further argues that she stopped requesting overtime after that time because she felt that Sheikh would never provide it.  (Response ¶ 20.)  Merisier does not provide evidence to support this assertion, and KCH disputes this account.  KCH points to a segment of Merisier's deposition in which Merisier testified that Sheikh accommodated her schedule when she was a student, that she had requested other changes to her work schedule but she could not remember specifics, and that she had not requested or worked overtime in the past five years.  (Def.'s Reply Mem., Exhibit A ("Merisier Deposition Excerpt") (Doc. No. 71-2) at 2; Def.'s Mot. Summ. J., Exhibit A ("Mot., Exhibit A" (Doc. No. 69-3) at 9–10.)[3]  Merisier asserts in her briefing that she gave up on asking for overtime after realizing that the denial of overtime was discrimination due to her race and her national origin.

---

[3] To the extent that Merisier alleges that the denial of overtime five years ago constituted an adverse employment action, that claim is now time-barred.  *See Green v. Brennan*, 136 S. Ct. 1769, 1784 (2016) ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges") (quoting *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002)).

Merisier cannot defeat the Defendant's motion for summary judgment "through reliance upon unsupported assertions" that are contradicted by the record. *Goenaga*, 51 F.3d at 18. Because Merisier did not present evidence to support her assertion that she requested or was denied overtime, and the record – including her own deposition testimony – indicates that Merisier has not requested or worked overtime in the past five years, Merisier's assertion that she was previously denied overtime and stopped requesting it is not sufficient to survive summary judgment. Therefore, Merisier has not met her burden to establish that the difference in pay between Merisier and the other phlebotomists gives rise to an inference of discrimination, rather than reflecting Merisier's personal choice.

Merisier's claim of pay discrimination is not barred under Title VII merely because, due to her lack of overtime, she does not perform work equal to that of phlebotomists outside of her protected class. *Cty. of Wash. v. Gunther*, 452 U.S. 161, 181 (1981). However, Merisier provides no evidence that the pay differential is a result of her race, color, or national origin, such as statistical evidence showing that her compensation is uniquely below market or evidence of discriminatory comments. *Cf. Lenzi*, 944 F. 3d at 112 (finding petitioner had made out a prima facie case of pay discrimination when she presented statistics showing her compensation was uniquely below-market, as well as pointing to discriminatory remarks made by the company's CFO.) Merisier again relies only on listing the race, skin color, and national origin of the other phlebotomists at KCH, as well as her subjective belief that the pay differentials between them are the result of discrimination based on her race and national origin, which, even viewing the evidence in the light most favorable to Merisier, is not sufficient to meet her burden.

Because Merisier does not show that the pay differences she has identified arise under circumstances giving rise to an inference of race, color, or national origin discrimination, she

does not make out a prima facie case of pay discrimination under Title VII.  Accordingly, KCH is entitled to summary judgment on Merisier's pay discrimination claim.

## IV.  Merisier's Retaliation Claim

To establish a prima facie case of retaliation under Title VII, an employee must show that: (1) he or she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  In determining whether a plaintiff has satisfied this burden, the court's role is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005).

KCH does not dispute that Merisier twice engaged in protected activity: once when she filed an internal complaint of discrimination in December 2013, and then again when she filed her complaint with the EEOC in January 2014.  (Mot. at 17–18.)  However, KCH argues that Merisier has failed to show a causal connection between the protected activity and any adverse employment action.  (Mot. at 17.)

Merisier filed her internal complaint on December 5, 2013, and shortly thereafter was called into a meeting, along with her union representative, to discuss her alleged use of profanity towards Foster.[4]  There is no dispute that KCH knew about this internal complaint on that date.  However, Merisier fails to show a causal connection between the protected activity and the disciplinary meeting she was required to attend.  Though a causal connection can be inferred

---

[4] In the parties' SOF submissions, they agree only that the disciplinary meeting occurred in December 2013. However, the SAC states that the meeting occurred on December 9, 2013, and KCH cites this date in its briefing. (SAC ¶ 4; Mot. at 17.)

from "very close" temporal proximity between the protected activity and the disciplinary

hearing, *see Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001), the disciplinary

hearing in December 2013 stemmed from the disciplinary process that commenced in August,

nearly four months earlier, after Foster reported Merisier's alleged profanity.  (Def.'s SOF ¶ 33;

Pl.'s SOF ¶ 33; *see also* Mildner Declaration, Exhibit I.)  The commencement of the disciplinary

process pre-dates the protected activity, so it is not possible that the disciplinary action is

retaliation for an action that had not yet occurred.  Accordingly, Merisier has not made out a

prima facie case of retaliation with respect to her internal complaint.

Merisier next engaged in protected activity on January 10, 2014, when she filed her

complaint with the EEOC.  In February 2014, Foster filed her complaint that Merisier had

threatened her and cursed at her, which was followed by the filing of disciplinary charges with

OATH.  Merisier relies on the close temporal proximity between her January 2014 EEOC

complaint and the disciplinary charges brought against her in February 2014 to raise an inference

of a causal connection, but this argument must fail.  Foster reported Merisier's threats to hospital

police in February 2014, and the disciplinary charges followed.  Where, as here, there was "an

intervening causal event that occurred between the protected activity and the allegedly

retaliatory" event, mere temporal proximity between the protected activity and the retaliatory

event is insufficient to support an inference of a causal connection between the two.  *Garcia v.

Yonkers Bd. of Educ.*, 2018 U.S. Dist. LEXIS 142514, at *18 (S.D.N.Y. Aug. 21, 2018)

(collecting cases).  Accordingly, Merisier fails to make out a prima facie case of retaliation for

her EEOC complaint.

Because Merisier has failed to meet her burden to show retaliation, KCH is entitled to

summary judgment on Merisier's Title VII retaliation claim.

## V.      Remaining State and Local Law Claims

Merisier's remaining causes of action are brought under the New York State and City Human Rights Laws.  "When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims."  *Artis v. District of Columbia*, 138 S. Ct. 594, 597–98 (2018) (citing 28 U.S.C. § 1367(c)).  Accordingly, this Court declines to exercise supplemental jurisdiction over and dismisses the state and local law claims without prejudice.

## CONCLUSION

For the reasons set forth above, Kings County Hospital's motion for summary judgment is granted in full.  The Clerk of Court is respectfully directed to enter judgment in favor of defendant Kings County Hospital, to mail a copy of the judgment and this Memorandum and Order to Merisier, and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York              *Roslynn R. Mauskopf*
         September 29, 2020

                                        _____
                                        ROSLYNN R. MAUSKOPF
                                        Chief United States District Judge